**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | |
|---|---|
| HECTOR SOTO SAEZ,<br>        Plaintiff, | No. 3:18-cv-2061 (SRU) |
| v. | |
| ANDREW SAUL,<br>        Defendant. | |

## RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS

In the instant Social Security appeal, Hector Soto Saez moves to vacate the decision by

the Social Security Administration ("SSA") denying his application for Supplemental Security

Income ("SSI") benefits.  *See* Mot. to Reverse, Doc. No. 16, at 1.  The Commissioner of the

Social Security Administration[1] (the "Commissioner") moves to affirm.  *See* Mot. to Affirm,

Doc. No. 17.  For the reasons that follow, I **deny** Soto Saez's motion and **grant** the

Commissioner's.

## I.        Standard of Review

The SSA follows a five-step process to evaluate disability claims.  *Selian v. Astrue*, 708

F.3d 409, 417 (2d Cir. 2013) (per curiam).  First, the Commissioner determines whether the

claimant currently engages in "substantial gainful activity."  *Greek v. Colvin*, 802 F.3d 370, 373

n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)).  Second, if the claimant is not

working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e.,

an impairment that limits his or her ability to do work-related activities (physical or mental).  *Id.*

(citing 20 C.F.R. §§ 404.1520(c), 404.1521).  Third, if the claimant does have a severe

---

[1] Since the filing of the case, Andrew Saul was appointed the Commissioner of Social Security.  He is
therefore automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

impairment, the Commissioner determines whether the impairment is considered "per se disabling" under SSA regulations.  *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  If the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record."  *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)).  "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment."  *Id.*  Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work."  *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)).  Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy."  *Id.* (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)).  The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria.  *See id.*

The claimant bears the ultimate burden of proving that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry.  *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418.  If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five.  *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). At step five, the Commissioner need only show that "there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's residual functional capacity."  *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374–75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447–48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek*, 802 F.3d at 375. Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II.   Facts[2]

Soto Saez applied for SSI benefits on December 23, 2015, alleging that he was disabled as of September 11, 2015. Statement of Material Facts, Doc. No. 16-1, at ¶ 1. As set forth more fully below, Soto Saez's application was denied at each level of review. He now seeks an order vacating the decision and remanding for a new hearing.

### A. Factual Allegations

Soto Saez suffers from a number of medical conditions, including, as of August 2016, obesity, hypertension, cardiomyopathy, cerebral infarction, hyperlipidemia, hypertensive heart

---

[2] The following facts are drawn primarily from Soto Saez's Statement of Material Facts, doc. no. 16-1, to which the Commissioner did not object.

3

disease with heart failure, Type 2 diabetes, obstructive sleep apnea, ocular ischemic syndrome, and tobacco dependence.  R. at 13–14, 991.

In September 2015, Soto Saez, who was 43 years old at the time, experienced an evolving acute infarct—a stroke—in the left posterior occipital lobe.  Statement of Material Facts, Doc. No. 16-1, at ¶ 18.  As a result of the damage sustained to his occipital lobe, Soto Saez suffered from vision problems, namely, a right-sided visual field deficit.  R. at 410, 787, 811.

 The blurry vision persisted, and on October 30, 2015, Soto Saez was evaluated by Dr. Adeniyi Fisayo, M.D., a neuro-ophthalmologist.  R. at 787–88; Statement of Facts, Doc. No. 16-1, at ¶ 22.  Dr. Fisayo diagnosed Soto Saez with right homonymous hemianopia and noted in his report: "I discussed with him that he does not meet legal requirements to drive and would pose a danger to himself and others if he does so.  As he previously worked as a tow truck driver, he would obviously lose his job."  R. at 788.

 Soto Saez continued to report blurry vision in follow-up appointments for diabetes, hypertension, and stroke throughout 2016.  R. at 930 (January 2016); R. at 936, 940 (February 2016); R. at 954 (March 2016); R. at 977 (July 2016).

As described in a Visual Medical Statement dated February 2017, David Ketner, M.D., Soto Saez's eye doctor, diagnosed him with non-proliferative Diabetic Retinopathy Right and Left Eye, Homonymous Hemianopia Rightsided, and Ocular Ischemic Syndrome Left Eye.  R. at 1105.  Dr. Ketner observed that Soto Saez "can't see things on his right side" due to the stroke, and opined that Soto Saez was not capable of safely operating motor vehicles.  *Id*. at 1105–06.  He further stated that Soto Saez could never perform work activities involving near or far acuity, but could perform activities involving field of vision for at least 67% of an 8-hour work day.  R. at 1106.

Paul Adamson, M.D., also submitted a medical opinion, dated March 2017.  Dr. Adamson noted Soto Saez's diagnoses of stroke and residual vision loss, and explained that Soto Saez was unable to drive as a result of those conditions.  R. at 1448.  Dr. Adamson opined that Soto Saez can walk more than three city blocks without needing to rest and without experiencing severe pain; can sit for more than two hours at a time before needing to get up; can stand for one hour at a time before needing to sit down or walk around; and, in an 8-hour working day, can stand or walk for about four hours and sit for at least six hours.  R. at 1449.

According to Dr. Adamson, Soto Saez requires a "job that permits shifting positions at will from sitting, standing, or walking."  *Id*.  Moreover, in an eight-hour working day, Soto Saez could, at most, continuously lift up to 20 pounds, frequently lift 21 to 25 pounds, and occasionally lift 26 to 50 pounds.  R. at 1450.  Dr. Adamson further expressed that, in an 8-hour working day, Soto Saez could continuously carry up to 20 pounds, could occasionally carry 21 to 25 pounds, and could rarely carry 26 to 50 pounds.  *Id*.  In light of the above limitations, Dr. Adamson estimated that Soto Saez would be absent from work about three days per month and would be off-task for at least 25% of a typical work day.  R. at 1451.

B. <u>Procedural History</u>

Soto Saez applied for SSI benefits on December 23, 2015, claiming that he was disabled as a result of carotid therapy, internal occlusion left, obesity, cerebral infraction due to vascular occultation, hypertension, type 2 diabetes, tobacco abuse, heart failure, cardiomyopathy, hyperlipemia, sleep apnea, and stroke since September 11, 2015.  Statement of Material Facts, Doc. No. 16-1, at ¶ 1; R. at 133.  The SSA denied Soto Saez's application on June 23, 2016.  Statement of Material Facts, Doc. No. 16-1, at ¶ 1.  Soto Saez sought reconsideration, but the

SSA adhered to its decision. *Id.* at ¶ 2. Soto Saez thereafter requested a hearing, which was held on January 24, 2018. *Id.* at ¶¶ 3, 4.

In a pre-hearing memorandum, Soto Saez's counsel asserted that a Title XVI application for SSI benefits is also a Title II application for Social Security Disability (SSD) benefits, and thus Soto Saez's entitlement to Title II benefits must be adjudicated as well.[3] *Id.* at ¶ 7; R. at 35. During the hearing, the ALJ noted at the outset that he received the memorandum, and discussed with Soto Saez's counsel how the record was unclear about whether Soto Saez enjoyed insured status for Title II purposes. *See* Statement of Facts, Doc. No. 16-1, at ¶ 11. The ALJ specifically observed that Soto Saez's earnings record included "some SGA earnings after the alleged onset date" and stated that he was under "the impression that those probably aren't [Soto Saez's] earnings." R. at 35. Soto Saez's counsel confirmed the ALJ's understanding, explaining that Soto Saez attempted on two occasions to resolve the issue, to no avail. *Id.*

The ALJ then heard from Soto Saez. Soto Saez testified that, as a result of the stroke, the right side of his body felt weak and he suffered a loss of vision, primarily in his right eye. R. at 44. He elaborated that, when he watches television, he can only see what is in front of him and "not the sides." R. at 50. He further testified that his prescribed medicine alleviates his

---

[3] A brief background on the statutory scheme is in order. The SSA offers "disability benefits under two programs, known by their statutory headings as Title II and Title XVI." *Smith v. Berryhill*, 139 S. Ct. 1765, 1772 (2019) (citing § 401, *et seq.* (Title II); § 1381, *et seq.* (Title XVI)). Title II "provides old-age, survivor, and disability benefits to insured individuals irrespective of financial need," whereas Title XVI offers "supplemental security income benefits 'to financially needy individuals who are aged, blind, or disabled regardless of their insured status.'" *Id.* (citing *Bowen v. Galbreath*, 485 U.S. 74, 75 (1988)). "The regulations that govern the two programs are, for today's purposes, equivalent." *Id.*

According to the SSA's Program Operations Manual Systems SI 00510.005B, "because all applications for title XVI payments [SSI benefits] are also applications for title II benefits [SSD benefits], adjudicators must take steps to determine whether the claimant is eligible for title II [benefits]. Unless an individual files a title II application concurrently with the title XVI application, the title II aspects of the title XVI application must always be closed out." *Shaw v. Chater*, 221 F.3d 126, 130 (2d Cir. 2000) (internal citations omitted). In order to be eligible for Title II benefits, an applicant "must be insured for disability insurance benefits," which means that an applicant must meet the following two requirements: he or she must have (1) "adequate social security earnings" and (2) "'disability insured status' in the quarter he [or she] became disabled or in a later quarter in which he [or she] was disabled." *Id.* (internal citations omitted).

headaches and that it "takes time" for him to read.  R. at 44.  He experiences no difficulty

walking, and is able to attend to his personal needs, such as showering and changing clothes.  R.

at 45, 46.

The ALJ next heard from Vocational Expert ("VE"), Steven Sachs, Ph.D.  The ALJ asked

Dr. Sachs to consider a hypothetical individual with Soto Saez's age, education, and work

experience who: (i) could lift and carry 40 pounds occasionally and 20 pounds frequently; (ii)

could sit, stand, and walk for six hours in an eight-hour work day; (iii) could frequently climb

ramps and stairs; (iv) could occasionally climb ladders, ropes, and scaffolds; (v) could frequently

balance, stoop, kneel, crouch, and crawl; (vi) would need to avoid concentrated exposure to

hazardous machines; (vii) could not drive automotive equipment; and (viii) must have

instructions demonstrated, rather than given in writing, due to visual defects.  R. at 52.  The ALJ

asked whether such an individual could perform Soto Saez's past relevant work, and Dr. Sachs

responded that Soto Saez could perform his prior job as a driver's helper.  *Id*.

The ALJ then asked whether there were "other representative occupations in the national

economy that could be performed."  R. at 52.  Dr. Sachs cited three occupations: (1) hand packer,

unskilled medium (DOT # 920.587-018), with 109,000 jobs nationally; (2) production worker,

unskilled medium (DOT # 762.684-026), with 60,000 jobs nationally; and (3) production

inspector, unskilled medium (DOT #369.687-014), with 10,000 jobs nationally.  R. at 52–53.

For the second hypothetical, the ALJ asked Dr. Sachs to assume that same individual as

in first hypothetical, but with the following additional limitations: (1) would be absent from the

workplace three times a month; (2) would be off-task at least 25 percent of the work day; and (3)

due to visual impairments, would not be able to avoid workplace hazards and would pose a risk

to the safety of coworkers and supervisors.  R. at 53.  Dr. Sachs responded that those limitations

would rule out all hypothetical employment.  R. at 54.

The ALJ subsequently asked, "Is all of your testimony today including the types and

numbers you cited to, is that consistent with your experience?", to which Dr. Sachs responded

"Yes."  R. at 54.  The ALJ then inquired: "[i]s it consistent with the information in the

[Dictionary of Occupational Titles ('DOT')]?", to which Dr. Sachs again responded, "Yes."  *Id*.

Dr. Sachs later confirmed that he derived the job incidence data for the hand packer,

production worker, and production inspector occupations from the Bureau of Labor Statistics.  R.

at 59.  Dr. Sachs explained that the Bureau of Labor Statistics does not list job incidence by DOT

number, but instead has what are known as "OES groupings"—each of which consists of many

DOT listings.  *Id*.  He elaborated that the DOT listing that he provided for the production worker

occupation, for example, was merely a "representative sample" of 185 different DOTs, and that

the incidence number he provided—60,000—reflected the total number of jobs for all 185 of

those DOTs.  R. at 60.

Soto Saez's counsel then asked, "Is it your testimony that all 185 DOT listings in

production worker all fit within the judge's specific hypothetical?", to which Dr. Sachs replied

"[n]o," explaining that he did not know how many of the 185 DOT listings actually fit into the

ALJ's hypothetical.  R. at 61.  The following exchange then took place:

> Q: So you would not know how many of those 60,000 jobs fit into the judge's
> hypothetical.  Is that right?
>
> A. Well, I – what I testified to was the 60,000 is the number that I represented to be
> within the hypothetical.  Lifting the 40 pounds down to 20.  But I can't tell you
> specifically what DOTs out of the 185 would fall into that 60,000.
>
> Q. So, and just so I can understand, that particular OES grouping that you used that had
> the 185 DOT listings; when you look at the job incidence there, is it higher than 60,000?
> Or is 60,000 for all 185 DOT listings?

A. No, actually, there are 90,000 for all 185. I reduced the number to 60 to accommodate the judge's hypothetical.

*Id.*

Dr. Sachs additionally clarified that the jobs of hand packer and production inspector may likewise include DOT numbers that do not fit the ALJ's hypothetical.  R. at 62.

C. The ALJ's Decision

On February 15, 2018, the ALJ issued an unfavorable decision, concluding that Soto Saez had not been disabled since September 11, 2015 and denying his application for supplemental security income.  Statement of Material Facts, Doc. No. 16-1, at ¶ 12.

In his decision, the ALJ noted at the outset that Soto Saez had filed an application for disability insurance benefits on November 13, 2015, "which was denied technically for lack of insured status [and] was evidently not appealed to the hearing level."  R. at 19 n.1.  The ALJ continued: "[a]lthough his official earnings record currently shows insured status being first insured on April 1, 2015 and last insured on December 31, 2017, there has been an allegation of the claimant's identity fraud with recent 2016 and 2017 earnings removed by SSA from his New Hire earnings record."  R. at 19.

Because the ALJ was "uncertain as to whether SSA's investigation of identity fraud ha[d] been completed to date particularly given the fact that the claimant only noted a couple of prior jobs on his Disability Report over the past 15 years while his WHAT earnings record shows numerous other short-term jobs prior to the year 2015," he was not convinced that Soto Saez's earnings record was accurate with respect to his date first insured and date last insured for Title II purposes.  *Id.*  For those reasons, the ALJ declined to escalate Soto Saez's application for disability insurance benefits to the hearing level, and directed the SSA to "re-assess whether [Soto Saez's] official earnings record is accurate."  *Id.*

With respect to Soto Saez's application for supplemental security income, the ALJ found, at the first step of the five-prong inquiry, that Soto Saez had not engaged in substantial gainful activity since September 11, 2015.  R. at 22.

At the second step, the ALJ determined that Soto Saez's congestive heart failure, cardiomyopathy, status/post cerebral vascular accident with bilateral right-sided visual defects, insulin-dependent diabetes mellitus, hypertension, and obesity constituted severe impairments; his obstructive sleep apnea, hyperlipidemia, headaches, history of pancreatitis, prior alcohol use, and mental impairments, however, did not.  *Id*.

At the third step, the ALJ found that Soto Saez's impairments were not per se disabling because they were not severe enough to meet the criteria of an impairment listed in 20 C.F.R. part 404, subpart P, Appendix 1.  R. at 25.

Before proceeding to the fourth step, the ALJ assessed Soto Saez's residual functional capacity ("RFC") and determined that Soto Saez could perform medium work work as defined in 20 CFR § 416.967(c),[4] with the following exceptions: he (1) can lift/carry up to 40 pounds occasionally and 20 pounds frequently; (2) can stoop, balance, kneel, crouch, crawl, and climb ramps/stairs frequently; (3) can climb ropes, ladders, and scaffolds occasionally; (4) must avoid concentrated exposure to hazardous machines with no driving of automotive equipment; and (5) as a result of bilateral visual field limitation, requires instructions to be demonstrated rather than written.  R. at 25.

At the fourth step, the ALJ determined that Soto Saez did not have the residual functional capacity to perform past relevant work as a farm tractor driver or as a driver's

---

[4] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 416.967.

helper/maintenance technician.  R. at 29.  In concluding that Soto Saez could not work as a

driver's helper, the ALJ discredited Dr. Sachs's testimony that Soto Saez could do so, reasoning

that the job "would not allow for the above-cited limitations since [Soto Saez] testified that this

job did involve some driving."  *Id.*

At the fifth and final step, the ALJ concluded—based on Soto Saez's residual functional

capacity, age, limited education, prior work experience, the Medical-Vocational Guidelines, and

the ALJ's testimony—that the jobs that Soto Saez could perform "exist[ed] in significant

numbers in the national economy."  R. at 30.  The ALJ explained that a finding of "not disabled"

would be warranted if Soto Saez had the residual functional capacity to perform the full range of

medium work, but that Soto Saez's ability to perform "all or substantially all" of the medium-

level requirements had "been impeded by additional limitations."  R. at 29.

In determining the extent to which those limitations impacted Soto Saez's ability to

perform medium-level work, the ALJ weighed Dr. Sachs's testimony:

> To determine the extent to which these limitations erode the unskilled
> medium occupational base, the Administrative Law Judge asked the
> vocational expert whether jobs existed in the national economy for an
> individual with the claimant's age, education, work experience, and
> residual functional capacity.  The vocational expert testified that given all
> of these factors the individual would be able to perform the requirements
> of representative occupations such as a handpacker, production worker
> and production inspector which number approximately 179,000, in the
> aggregate, otherwise exertionally medium, unskilled positions in the
> United States which he could perform.

R. at 29.

The ALJ noted that Soto Saez's counsel "appeared to object" to the job numbers offered

by Dr. Sachs during cross-examination on the ground that Dr. Sachs's methodology was

unreliable.  R. at 30.  The ALJ overruled that objection, concluding that the information was

reliable because Dr. Sachs had "extensive professional knowledge and experience in job

placement." R. at 30.  The ALJ next determined that, pursuant to SSR 00-4p, Dr. Sachs's

testimony was consistent with the information located in the Dictionary of Occupational Titles

("DOT").  *Id.*  The ALJ therefore concluded that Soto Saez was not disabled from September 11,

2015 through February 15, 2018, the date of the opinion.  *Id.*

      The matter was thereafter appealed to the Appeals Council, and the Appeals Council

denied the request for review on October 19, 2018.  Statement of Material Facts, Doc. No. 16-1,

at ¶ 12.

## III.    Discussion

      On appeal, Soto Saez contends that he is entitled to a vacatur of the Commissioner's

decision.  *See generally* Mot. to Reverse, Doc. No. 16-1.  Soto Saez principally argues that (1)

the ALJ's vocational analysis was defective because the ALJ failed to resolve several

inconsistencies between the DOT and Dr. Sachs's testimony regarding the jobs available to Soto

Saez; and (2) the ALJ, "without good cause," refused to adjudicate the Title II claim.  *Id*. at 7,

13.  The Commissioner counters that (1) the ALJ's finding that Soto Saez could perform work

that exists in significant numbers in the national economy was supported by substantial evidence,

and (2) the ALJ properly declined to adjudicate the Title II claim.  Doc. No. 17-1, at 5, 8.  I

address each argument in turn.

   A.  <ins>Substantial Evidence Supports the ALJ's Determination at Step Five that Jobs Exist in
Significant Numbers in the National Economy that Soto Saez Can Perform.</ins>

      If a claimant has demonstrated that his or her residual functional capacity prevents a

return to "past relevant work," *Greek*, 802 F.3d at 373 n.2 (citing 20 C.F.R. §§ 404.1520(e), (f),

404.1560(b)), there is a "limited burden shift" to the Commissioner to show that "there is work

in the national economy that the claimant can do," *Poupore*, 566 F.3d at 306.  Work exists in the

national economy when "there is a significant number of jobs (in one or more occupations)"—located either in the "region" in which the claimant lives or in "several other regions in the country"—that the claimant can perform with his or her "physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(a), (b). Work does not exist in the national economy, however, if there are merely "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region" where the claimant lives. 20 C.F.R. § 404.1566(b).

In determining whether sufficient work is available to the claimant, the SSA "relies primarily" on the DOT[5] "for information about the requirements of work in the national economy," and "may also use VEs . . . to resolve complex vocational issues." *Lockwood v. Comm'r of Soc. Sec. Admin*., 914 F.3d 87, 91 (2d Cir. 2019) (citing SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000)). The occupational evidence provided by a VE "should be consistent with the occupational information supplied by the DOT." SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000). In light of that requirement, the ALJ is tasked with inquiring, on the record, "whether or not there is such consistency," and, when an "apparent unresolved conflict" exists between the evidence proffered by the VE and the DOT, the ALJ "must elicit a reasonable explanation for the conflict before relying on the VE['s]" evidence. *Id*.

Applying those regulations, the Second Circuit in *Lockwood* held that the Commissioner erred by not probing into an apparent conflict between the vocational expert's testimony and the DOT before relying on the testimony. *Lockwood v. Comm'r of Soc. Sec. Admin.*, 914 F.3d 87, 92 (2d Cir. 2019). In that case, the vocational expert testified that three jobs existed in significant

---

[5] The Dictionary of Occupational Titles ("DOT") is a publication by the Department of Labor that "gives a job type a specific code . . . and establishes, among other things, the minimum skill level and physical exertion capacity required to perform that job." *Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 446 (2d Cir. 2012).

numbers in the national economy that could accommodate the petitioner's limitation of avoiding overhead reaching.  *Id*. at 92–93.  The DOT, however, stated that each of those three occupations required "occasional or frequent 'reaching.'"  *Id*. at 92 (internal citations omitted).  The Court held that the apparent conflict between the DOT and the vocational expert's testimony triggered "the Commissioner's duty to elicit an explanation that would justify crediting the testimony," and emphasized that the Commissioner "bears an 'affirmative responsibility' to ask about '*any possible conflict* between [vocational expert's] evidence and information provided in the [DOT].'"  *Id*. at 92–93 (citing SSR 00-4p, 2000 WL 1898704, at *4).  The Court further concluded that the question posed by the ALJ to the vocational expert during the hearing— whether his opinion is consistent with the DOT—was insufficient to satisfy the ALJ's burden. *Id*. at 93–94.

 In the case at bar, Soto Saez first argues that Dr. Sachs's testimony that three unskilled, medium-level jobs—hand packer, production worker, and production inspector—could accommodate a claimant's limitation of lifting and carrying 40 pounds occasionally and 20 pounds frequently conflicted with the DOT.  I agree.  The DOT defines "medium" work as requiring lifting and carrying up to 50 pounds occasionally and 25 pounds frequently;[6] clearly, if Soto Saez is restricted to lifting 40 pounds occasionally and 20 pounds frequently, he would have difficulty performing a job that requires lifting in excess of that amount.

 Although Dr. Sachs did not resolve that conflict with respect to the hand packer and production inspector jobs, and the Commissioner thus erred by failing to inquiry further, Dr. Sachs did resolve the conflict with respect to the production worker job.  As Soto Saez concedes,

---

[6] The DOT specifically defines medium work as "exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects."  UNITED STATES DEP'T OF LABOR, OFFICE OF ADMIN. LAW JUDGES LIBRARY, *Dictionary of Occupational Titles – Appendix C* (4th Ed., Rev. 1991).

Dr. Sachs testified that his production worker incidence number accounted for the lifting restriction; he reduced the number of jobs available for the production worker position from 90,000 to 60,000 to comport with the restrictions of lifting 40 pounds occasionally and 20 pounds frequently. *See* R. at 61 ("what I testified to was the 60,000 is the number that I represented to be within the hypothetical. Lifting the 40 pounds down to 20."). Accordingly, Dr. Sachs resolved that conflict, and the ALJ was not obligated to seek further explanation.

Any error with respect to the production inspector and hand packer jobs was therefore harmless. *Whitaker v. Berryhill*, 2018 WL 4583508, at *13 (D. Conn. Sept. 25, 2018) ("Even in the face of an oversight, the ALJ's decision may be upheld if the error was 'harmless,' that is, if other 'substantial evidence in the record' supports the ALJ's conclusion."). Soto Saez has not levelled any other challenge to Dr. Sachs's testimony that an individual with Soto Saez's limitations could serve as a production worker, and I discern no evidence in the record suggesting otherwise. *Richardson v. Berryhill*, 2019 WL 4764834, at *9 (D. Conn. Sept. 30, 2019) ("[E]ven if a conflict [between the DOT and the ALJ's residual functional capacity] might be perceived and the ALJ erred by not making inquiry in this regard, such error would be harmless because the ALJ identified two other jobs that an individual with the Plaintiff's RFC could perform and that exist in significant numbers in the national economy. . . . The Plaintiff raises no challenges to the ALJ's findings concerning these other positions and as such, even if it was error to include the job of the Assembler (or to fail to inquiry into a potential conflict between the DOT and RFC), the outcome at Step Five would be the same."); *Salati v. Saul*, 415 F. Supp. 3d 433, 448 (S.D.N.Y. 2019) ("Because the VE identified multiple jobs that exist in significant numbers in the national economy that a hypothetical individual with Salati's limitations could perform . . . and there is no evidence that a person with those limitations could

15

not perform those jobs, Salati's argument does not provide a ground for remand."). For those reasons, I conclude that the ALJ's determination that Soto Saez could meet the requirements of a production worker is supported by substantial evidence.

I further conclude that the ALJ's finding that Soto Saez could perform jobs existing in the national economy in significant numbers was supported by substantial evidence. Courts in this circuit "have refused to draw a bright line standard for the minimum number of jobs required to show that work exists in significant numbers," but have applied a "relatively low threshold number." *Koutrakos v. Colvin,* 2015 WL 1190100, at *21 (D. Conn. Mar. 16, 2015) (internal citation omitted) (collecting cases). Here, the ALJ adopted Dr. Sachs's testimony that 60,000 production worker jobs were available in the national economy.[7] That number readily satisfies the Commissioner's burden; courts in this district have routinely held that numbers less than 30,000 meet the "significant number" threshold. *Hernandez v. Berryhill*, 2018 WL 1532609, at *16 (D. Conn. Mar. 29, 2018) (collecting cases); *accord Daniels v. Astrue*, 2012 WL 1415322, at 17 (S.D.N.Y.2012) (concluding that 1,236 jobs in the NYC area and 25,000 jobs nationally to be significant); *Gray v. Colvin*, 2014 WL 4146880, at *6 (W.D.N.Y. Aug. 19, 2014) (holding that 16,000 jobs nationally and 60 jobs regionally was significant, "given the low threshold evidently

---

[7] I note that neither the ALJ nor Dr. Sachs addressed the number of local jobs available to Soto Saez. There appears to be disagreement in this district regarding whether the availability of local jobs bears on the inquiry at hand. *Compare Consiglio v. Berryhill*, 2018 WL 1046315, at *8 (D. Conn. Feb. 26, 2018) ("[T]he number of jobs available in the local economy is not relevant, because the ALJ determined plaintiff could have performed a significant number of jobs in the national economy"); *Lillis v. Colvin*, 2017 WL 784949, at *6 (D. Conn. Mar. 1, 2017) ("That the VE here did not have specific expertise in the Connecticut job market is not of consequence. To meet her burden at step five, 'the Commissioner need show only one job existing in the *national economy* that [claimant] can perform.'") *with Durante v. Colvin*, 2014 WL 4843684, at *5 (D. Conn. Sept. 29, 2014) ("The proper geographic baseline for this measure is neither the state nor the nation, but 'the region where [the claimant lives] or in several regions of the country."). And as I observed in *Hernandez v. Berryhill*, 2018 WL 1532609, at *17 (D. Conn. Mar. 29, 2018), the language in the relevant Social Security regulation is fairly ambiguous in offering guidance to this question. *See* 20 C.F.R. § 404.1560(c)(2) ("Any other work (jobs) that [the claimant] can adjust to must exist in significant numbers in the national economy (either in the region where [she] lives or in several regions in the country)."). In any event, I need not address here whether that omission amounts to reversible error, because Soto Saez did not raise that argument in his briefing.

required, and the Social Security Act's emphasis on providing benefits only to claimants 'who cannot engage in any other kind of substantial gainful work which exists in the national economy'")*; see also Sena v. Berryhill*, WL 3854771, at *15 (D. Conn. Aug. 14, 2018)  ("[T]he VE testified that there was a total of 55,000 jobs nationally between the two occupations provided—a number that easily qualifies [as significant].").  For that reason,  I conclude that the Commissioner's burden here was met.

To the extent Soto Saez argues that Dr. Sachs's testimony was unreliable because his job incidence data "included part-time work, with unknown numbers of hours," that argument is without merit.  The SSA regulations provide that part-time work can qualify as substantial, 20 C.F.R. § 404.1572(a) ("Your work may be substantial even if it is done on a part-time basis  . . . .), and Soto Saez cites to no facts or authority suggesting that any such work was not substantial here.  *See Pires v. Astrue*, 553 F. Supp. 2d 15, 25 (D. Mass. 2008) ("Plaintiff's contention that one or all of these jobs might offer only part-time employment is irrelevant to the disability determination.").

In sum, I conclude that substantial evidence supports the ALJ's determination that Soto Saez is able to adjust to other work—that is, production worker jobs—which exists in significant numbers in the national economy.  I therefore decline to address Soto Saez's remaining arguments that, contrary to Dr. Sachs's testimony: (1) production inspector jobs, as defined in the DOT, would not accommodate the need to have instructions demonstrated, rather than given in writing, and (2) the driver helper position, as defined in the DOT, would not accommodate the inability to drive a automotive vehicle.  *Whitaker*, 2018 WL 4583508, at *13.  I note, however, that Soto Saez's latter argument is unavailing.  To be sure, I agree with Soto Saez that a conflict existed between Dr. Sachs's testimony and the DOT description, which provides, inter alia, that a

driver's aid "[m]ay drive to relieve driver."  United States Dep't of Labor, Office of Admin. Law Judges Law Library, Dictionary of Occupational Titles, *Driver Helper, DOT # 292.667-010* (4th Ed., Rev. 1991).

The ALJ, however, expressly discredited such testimony; he concluded that Soto Saez would not be able to perform the job of driver's helper because that position "would not allow for the above-cited limitations since the claimant testified that this job did involve some driving." R. at 29.  To the extent Soto Saez argues the ALJ erred by failing to specifically state that the VE's testimony conflicted with the DOT, Soto Saez provides no authority in support.  To the contrary, the ALJ was not obligated to reconcile any conflict because he did not rely on Dr. Sachs's testimony.  SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000) ("the adjudicator must resolve this conflict [between the VE's testimony and the DOT] *before relying on the VE['s] . . evidence"*) (emphasis added).

For all the foregoing reasons, I conclude that the ALJ's determination that Soto Saez was capable of successfully performing work in the national economy was supported by substantial evidence.

B.  The ALJ Did Not Err in Declining to Adjudicate Soto Saez's Title II Application.

Soto Saez next argues that the ALJ failure to adjudicate the Title II claim was legal error. Judicial review of that claim, however, is foreclosed because I do not have subject matter jurisdiction to decide it.

Under 42 U.S.C. § 405(g), judicial review is limited to "any *final* decision of the Commissioner of Social Security made after a hearing."  *Califano v. Sanders*, 430 U.S. 99, 108 (1977) (emphasis added).  In *Smith v. Berryhill*, the Supreme Court held that the Appeal Council's dismissal of a request for review on timeliness grounds qualified as a "final" decision

18

entitling the petitioner to judicial review.  *Smith v. Berryhill*, 139 S. Ct. 1765, 1774 (2019).

"Dismissals 'are binding and not subject to further review' by the SSA."  *Id*. at 1772 (citing 42

U.S.C. § 416.1472).

In so holding, the Court reasoned that "the phrase 'final decision' clearly denotes some

kind of terminal event."  *Id*.  As support, the Court cited to the Oxford English Dictionary, which

defines "final" as "[m]arking the last stage of a process; leaving nothing to be looked for or

expected; ultimate)."  *Id*. at 1774 n.8.  The Appeal Council's dismissal, the Court reasoned, "fits

that language: Under the SSA's own regulations, it was the final stage of review.'"  *Id*.  (citing

20 CFR § 416.1472).

Unlike the dismissal in *Smith,* here, the ALJ merely declined to "escalat[e] the claimant's

application for disability insurance benefits to the hearing level" and instead directed the SSA to

"reassess whether the claimant's official earnings is accurate and correct."  *Id*.  The Title II

decision was thus not "terminal" or "final" or "claim-ending;" it instead invited further review

and development of the record.  Accordingly, the ALJ's decision here is more analogous to an

Appeal Council order vacating an ALJ's decision and remanding for further proceedings, which

the Second Circuit has noted does not qualify as a "final decision."  *See Iwachiw v. Massanari*,

125 F. App'x 330, 331 (2d Cir. 2005) (internal citations omitted); *see also Harper v. Bowen*, 854

F.2d 678, 680 (4th Cir. 1988) ("remand orders in Social Security cases are not final, appealable

orders").   For those reasons, although there is a "strong presumption that Congress intends

judicial review of administrative action,"  *Smith*, 139 S. Ct. at 1776 (citing *Bowen v. Michigan*

*Academy of Family Physicians*, 476 U.S. 667, 670 (1986)), I conclude that the presumption has

been overcome in this case.

Even if I do enjoy subject matter jurisdiction, Soto Saez's claims are without merit.  Soto Saez appears to specifically challenge (1) the ALJ's statement in his decision that Soto Saez filed a Title II application dated November 13, 2015 when that application was not in the record, and (2) the ALJ's refusal to consider the Title II application even though Soto Saez's counsel raised the issue at the hearing.  But Soto Saez points to no authority establishing that the foregoing actions amount to reversible legal error.  Moreover, even if it was improper for the ALJ to refuse to escalate the Title II application on the ground that the argument was not raised at the hearing, the ALJ nonetheless articulated a separate, valid reason for declining to adjudicate the application: the record needed to be further developed.  That action comported with the regulations governing appeal procedures, which authorize sending claims back for further development:

> [a]fter you request reconsideration, your case file will be reviewed and prepared for the hearing. This review will be conducted in the component of our office (including a State agency) that made the initial or revised determination, . . . *If necessary, further development of the evidence, including arrangements for medical examinations, will be undertaken by this component.* After the case file is prepared for the hearing, it will be forwarded by this component to the disability hearing officer for a hearing. *If necessary, the case file may be sent back to this component at any time prior to the issuance of the reconsidered determination for additional development.*

20 C.F.R. § 404.916(c) (emphasis added).

For those reasons, I conclude that the ALJ's decision declining to adjudicate Soto Saez's entitlement to Title II benefits was without legal error.

**IV.**     **Conclusion**

For the reasons set forth, I **grant** the Commissioner's motion to affirm and **deny** Soto

Saez's motion to reverse.  The Clerk is directed to enter judgment in favor of the Commissioner

and close the case.

So ordered.

Dated at Bridgeport, Connecticut, this 20th day of May 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge